Oral argument not to exceed your attainment to reside, Mr. Patrick Desmond or Ms. Helen. Good morning, your honors. Christopher Desmond on behalf of the plaintiffs. I'd like to reserve three minutes for rebuttal if possible. Your honors, unlike the case you just had argued before you, this case is fairly straightforward. The parties agree on many of the facts. They agree on the legal standard that applies. Essentially, there's one question before the court today. And that's whether or not a reasonable jury could find that the meal times of the Motorcity Casino security guards are properly classified as work time and therefore must be compensated. Now, in answering that question, I've sort of identified during our brief three different guiding principles, if you will. And these are pretty straightforward, simple principles. The first two come from this court's opinion in Hilvey, United States. And this is an opinion that both parties cite to for the notion that the controlling standard when determining compensability of meal time is whether or not that meal time primarily works to the benefit or predominantly works to the benefit of the employer versus the employee. Hill states that in making that determination, we have to look to the totality of the circumstances. So that's sort of the second guiding principle, which I think is important in this case because that's where I think the trial court committed the error that it committed in this case. I think it focused on particular factors without looking at the totality of the circumstances faced by these particular employees. The third principle that I'd like to direct the court to very quickly, and this comes from a variety of cases from throughout the country that we've cited to, is the notion that if there's a dispute regarding whether or not one reasonable juror versus another reasonable juror, how they would classify the meal time. That's a question that must be submitted to a jury in a trial and isn't an issue that's properly decided through a motion for summary judgment. I'm a little confused here. A jury normally decides disputes and facts. And you kind of started out that the parties basically agree on the facts. And aren't you going to the legal conclusion then that you want the jury to determine a legal conclusion as opposed to a factual dispute? I understand the point, Your Honor. And I would say from the outset, while we do agree on many of the underlying facts of this case, and I guess this happens whenever parties enter into a stipulation to a degree, people sort of try to stretch the stipulation in whatever direction they can to whatever degree they can. For example, while we argue that there were frequent interruptions during the lunch breaks, in this case through the security guard's radios, and we cite to specific deposition testimony for that point, defendants frequently in their brief reference to the fact that the interruptions in this case were minimal and that the interruptions weren't so pervasive that they interfered with our client's ability to engage in other activities during their meal times. I would say that that is a disputed fact. So I think there are certain disputed facts that are relevant to the issue of compensability. But even beyond that, the point you make is obviously a strong point, and it's a point that— I agree with the basic principle that the facts are not a dispute, and the only thing is whether the legal conclusion that you draw from the facts is normally for the court, not for the jury, right? I would say ordinarily when it's a pure question of law, which I don't think we necessarily have in front of us today, ordinarily a question of law is reserved for a judge as opposed to a jury. But I would direct the court to two different opinions, and actually it's more than two opinions. Our brief cites to a variety of opinions that were submitted to the jury on this issue, and it wasn't necessarily because the parties disagreed about underlying material facts. For example, I believe both of the Tenth Circuit cases that we've cited to, which I think are the most analogous cases to the present factual circumstances we have in front of us. That's Lamont v. City of Shawnee, and then Beasley v. Hillcrest Medical Center, which applies the Lamont standard. In each one of those cases, they say that this is a tribal issue because a jury— Predominance is a tribal issue. What's that? Predominance. Yeah, yep. Predominance is a tribal issue, and I believe Beasley— They say it's a mixed question of fact and law, or— Well, they literally use the term tribal issue, Your Honor. And they say that, for example, in Beasley, Beasley involved a situation in a medical center where the nurses or the medical staff— Seventy-five percent of their time they were getting distracted. Right. They had pagers on them, and the pagers would be going off, and the court said that based on their testimony that these interruptions in their lunch periods were pervasive, that reasonable jurors could disagree regarding the predominance issue, and it was their— Did the record here show anything of that extent and degree in terms of the effect that having to have the radios on all the time had upon their ability otherwise to enjoy an undisturbed or undistracted lunch? Yes, Your Honor. We've got testimony from two different security guards, and they're actually individuals who are in an interesting posture in this case because in addition to being security guards, they're actually dispatchers, not necessarily supervisors of the other security guards, but they sort of play that supervisory role, Ms. Webb and Ms. Kirby. And I believe it's Ms. Kirby that offers probably the strongest testimony on this point when she says that any activity that she engaged in in her lunch was secondary to monitoring her radio, that she never felt she had a full uninterrupted lunch period, and that even things such as making a personal phone call she couldn't do because those radios were constantly active. And it's not just that the radios were constantly active, and this is sort of a common-sense statement to make, but I think it gets overlooked. You don't know what's being said on a radio unless you are actively listening to it. Now, it could be that Ms. Kirby's name—and the record doesn't show this, to be clear, but it could be that Ms. Kirby's name was only said on the radio during her lunch break once every month, but she doesn't know if it's being said unless she's actively dedicating her focus to what the words are that are coming across on that device. Now, she said that because of that, she's been distracted during the course of her lunch break and has had to dedicate her time to work functions. The failure to respond—and the record's clear on this—the failure to respond to a radio call is disciplinary in nature. You can be suspended if you're not listening to your radio during your lunch period. Of course, monitoring the radio is only one aspect, and again, this is where—I'm sorry, Your Honor. Go ahead. Keep going. Well, monitoring the radio is only one aspect that's involved in this case, and again, this is one of the reasons why we direct the court to LeMond v. City of Shawnee from the 10th Circuit. The 10th Circuit did an excellent job in that case of recognizing what this court said in Hill, which is that you have to look to the totality of the circumstances. So, for example, in LeMond, the court focused on the fact that not only was there vigilant monitoring of a radio system, but that the plaintiffs in that case were limited geographically in terms of where they could go. 30 or 40 miles. In LeMond, correct. It was a 30 or 40-mile radius. It was essentially the sector that the officers were assigned to in that case. In this case, we're looking at two to three break rooms with inside the Motor City Casino. They could go outside and walk? Well, the stipulation that the parties entered into states that they were limited to two to three break rooms and that with permission, they could go to the casino's gift shop and they could go to their cars with permission. They were not allowed to leave the premises. They couldn't leave the premises. So certainly in terms of a geographical restriction, the restriction in this case is far more severe than the restriction in LeMond, far more severe than the restriction in the Avery v. City of Talladega case, which defendants rely on, which is another police officer case where the police officers were limited to the entire city limits of Talladega. That's not what we have here. The LeMond court also focused on the fact that because of, whether it was because of the geographic restrictions or because of the need to monitor radios, the plaintiffs in that case couldn't engage in taking care of other personal needs during their lunch period, such as running personal errands. Someone needed to run to a pharmacy. They couldn't do it. They were limited in the LeMond case. Similarly, we have those same restrictions in our case. Because our plaintiffs aren't allowed to leave the premises, they aren't allowed to take care of those tasks that otherwise, if you had an entirely free 30-minute or one-hour lunch period, you would presumably be able to do. So, Your Honor, we would direct the court mostly to LeMond and Beasley as well as this court's opinion in Martin v. Ohio Turnpike. Now, Martin v. Ohio Turnpike, defendants are somewhat critical of our reliance on that case because admittedly it is not a mealtime case. It is an on-call case. However, the court clearly emphasizes in the on-call jurisprudence in this circuit that the predominant benefit test applies equally. So the same notions and the same rationale that apply to the court in the present case apply in the on-call cases. Now, in Martin, summary judgment was properly granted to the plaintiffs. But the interesting portion of Martin for our purposes today is the Martin discussion of cross... Granted to the plaintiffs in Martin? I'm sorry, granted to the defendants in Martin. But what Martin is useful for is the discussion in Martin of Cross v. Arkansas Forestry, which is an Eighth Circuit case, where they talk about the idea of radio interruptions of free time. And Martin specifically says that the reason why summary judgment was proper in that case was because the radios were not a pervasive presence in the Martin case like they were in the Cross case. So in other words, had the Martin plaintiffs presented the type of evidence that we've presented in this case, it would have been at a minimum an issue to go forward to a jury. In this case, when the various plaintiffs talked about interruptions, were they more specific? Are interruptions described as just listening to the chatter that is going across the radio, but where there's really no need for the employee to respond, there's no emergency, there's nothing that's going to require their attention. It's simply having to be attuned to... It varies, Your Honor. We've got, as the panel is aware, I believe we have over 50 named plaintiffs in the present action. And so each one of their individual situations is going to slightly vary. For the most part, though, the parties have essentially stipulated in the testimony was that in terms of being actually pulled out of your lunch period, that was not a very common occurrence. In general, the type of interruptions we're talking about are listening to your radio to figure out whether or not there is an emergency. Distraction rather than disruption, in a sense. I mean disruption, at least I would consider, yeah, oops, there's an emergency out on the floor, drop everything, run out there and handle it. It's simply that it's always background or you would say foreground in terms of the half hour they're trying to take. Correct? Yeah, I'd say that's a fairly accurate description, Your Honor. And I don't think, to be frank, I don't think that fact necessarily hurts us. If you look to this court, it's an unpublished opinion that defendants and the trial court both heavily relied on, which is the Miracle opinion. In Miracle, which again, summary judgment in that case was granted to the defendant, but in the Miracle opinion, the court noted that the types of disruptions in that case weren't so severe that the plaintiffs were unable to pursue their mealtimes in peace. They talk about notions such as peace, tranquility, the idea of being able to be relaxed during this break period, this period that you're supposed to be removed from the work setting. In this case, that's not what has happened. And the testimony from both of our dispatchers is clear that they viewed all of the people who were on their break periods as being a part of their entire workforce. They've stated that without those individuals, we wouldn't be able to fully run the security force of our casino. So it's clear that the casino has gotten a large benefit from having these individuals on call, focused on their radios, during this period that they're not supposed to be working. I don't think there's any dispute that the casino benefits from the employees having to listen to the radios during their lunch break. But the legal question is whether the break is predominantly beneficial for the employer. I guess that's your burden here. Agreed, Your Honor. Just the undisputed facts of predominance. You have, well, they have to listen to the radio, but everything else, the employee is free to do what they want. I don't know how you can say it's the predominant. I see my time is up, Your Honor, but just very quickly, I would obviously disagree with that assertion in terms of the idea. If the standard were some benefit to the employer, I'd agree with you. There is some benefit here, but is it the predominant benefit of the time? I would say it is. And what I would most take issue with in terms of your statement is the idea that they're free to do whatever they want. The record's clear that they're not free to have food delivered into the casino. They're not free to have loved ones come to meet them during this break period to eat or interact with their loved ones or their friends. They're not free to leave the grounds of the casino. They can make phone calls, but essentially they're making their phone calls in one of these two to three break rooms where they're surrounded by their coworkers. So privacy is very limited. And to the degree that they're making those phone calls, of course, again, they're limited in terms of their obligation to monitor their radio. So I would disagree regarding the assertion that they're free to do whatever they want. Thank you very much. Good morning. Eric Pelton on behalf of the defendant, Appley, Motor City. There's no question here that courts have repeatedly held across the country where you're monitoring a radio only for an emergency situation while on a meal break, and when you're rarely interrupted and when you can make up that interrupted break, all factors that are present here, then the meal is not predominantly for the benefit of the employer and it's not compensable work time. And summary judgment has been granted in a number of the cases that we cited from sister circuits as well as the commute time case of Aiken in this circuit. So plaintiffs are really, and I don't think they're really arguing against that, they really distill it down to one issue, and that is they're left to argue that this background chatter is in itself an interruption or somehow interferes with their ability to enjoy their break. And it's not incumbent on the employer to provide an idyllic meal setting. And as Judge Griffin just pointed out, the test isn't an absence of all duty nor whether the employer may receive a benefit. The issue is whether the meal period is spent predominantly for the benefit of the employer. Now let's look at the undisputed facts here. First of all, they have all kinds of freedoms during their lunch period, their meal period. That's undisputed, it's stipulated. They have one requirement. That's to listen to that radio in case there's a code 416, an all-hands-on emergency, and that's what would jump off the radio and say, I've got to leave my lunch break. And this is a very rare occurrence. The stipulation says it occurs occasionally. Mr. Tibbs testified one time in ten years has he been called off of his break for an emergency. Ms. Webb said never has she been called off her break for an emergency. And Ms. Kirby said maybe more than five times, not sure about ten times, in eight years. It's a rare instance. It's also undisputed here that they're able to make up that time if on the rare occasion it happens. So they're listening for this one thing, and that's it. So the stipulation of the parties, I think, renders irrefutable that this is not an interruption in their meal, that they have to listen to a radio. First and most significantly, can they pursue their meal time adequately and comfortably? Sure they can. Ms. Webb's testimony was indicative of this. She was asked, can you eat while you are listening to the radio? Her answer was yes. So you're not performing your regular duties out on the floor? Yes. That's page 42 of her deposition. The radio, as the Meno Court in Massachusetts put it, really is peripheral to the purpose of the meal break, which is to eat. But here they can do a lot more than just eat. Mr. Tibbs testified he reads the Bible on his break. He can listen to the radio and he can read the Bible. Others said they socialize, play games, use the Internet, make personal calls, conduct personal business, enjoy the walking path. And there's cases with far greater limitations that did not render at work time. They provide a lot of benefit here. They don't have to. The 2004 Department of Labor opinion, I think, is instructive on this that we cite in our brief. They're confined to a small break room. They cannot make personal calls. They can't go out and smoke. But they could eat and were relieved of work. In the Department of Labor opined that was not compensable work time. This isn't the case, I think this court drew a very good picture in the FW Stock case, of the worker who's got a sandwich in one hand and is oiling their machine in the other hand. That's not this case. Nor is it the Beasley case out of the Tenth Circuit. Again, the nurses were required to eat at their work station in the hospital. They had to constantly answer doctor inquiries, nurse inquiries. That's the one in which the record indicated that about 75% of the time they're dropping and they're tending to a patient on the floor somewhere. That's correct. It's disruptive, much more disruptive than distracting in that situation in here. That's correct. It's more than disruptive. You're being called off your break to work. That's not our case at all. The only evidence they really proffer that this radio chatter, some hear as an inconvenience, I think I heard, rather than an interference, is Kirby's testimony. What does she say? She says, well, there's this constant chatter. I can't block anything out. I've got to listen to it. But Ms. Kirby also testified that she makes personal calls, albeit she might keep them short. She testified that she uses the Internet. She said, I could read. I choose not to. What she really likes to do is socialize. And as a dispatcher, she's responsible for scheduling everyone's break. There's 20 or 30 officers working at any one time. And what does she say? I try to schedule the break with my friends so we can socialize and chit-chat on our break. This is hardly an interruption or an interference. And that's it. Otherwise, they're free to engage in all of these other activities. So they're kind of painting this picture that they've got to sit there, stare at a radio, and listen to every single word. That's not the case. They've got to listen to one thing, a 416 emergency. And they all testify that their real jobs, their on-duty jobs, they're multitasking a lot. And they're not performing any of those duties. But listen to what they do on their regular duties. Ms. Kirby, a dispatcher, says, I have to know where every officer is at all times. And listen to the radio very carefully for all of that. Where is everyone? Who's at what post? I have to manage the breaks. I have to deal with customers. I have to do lost and found, answer questions from the public. I have to talk to supervision. I'm constantly using the radio. I'm writing reports for medical issues, fights, lost and found. And I keep activity logs of what's going on in the casino. And she does all of these things while she's working while listening to the radio. She's a multitasker. She's able to do all of that. And you're telling me you can't go on your meal break and only have to listen for one thing while you're socializing? That's not the kind of interruption that says that this is work time. Ms. Tibbs and Webb's testimony was very similar. And Ms. Webb's very illustrative of this. She was asked about how the radio works when she's working and how it works when she's on break. And she said, when on break, it's a very different use of the radio than when I'm actively working. Why? Because they're only listening for this one emergency situation. So it's a minimal requirement. And it only becomes work in those very rare occasions where they're called off of their lunch break and have to respond to emergency. And they can make it up when it does. There's no dispute about that. I think the Haviland Court summed this up pretty well. The Iowa case that Judge Murphy relied on, it's a very nice discussion of this issue. They said, an occasional benefit to the employer limited to one aspect, an emergency response that rarely occurs is not sufficient to turn meal period into working time. And to hold otherwise would impose a completely relieved of duty standard. And, of course, this court rejected that in Hill many, many years ago. I'd like to think, in terms of these on-call, off-duty on-call cases in the Aiken case, I want to suggest a framework in which the court can think about this. Aiken was a commute time case. And the holding there was that monitoring a police radio for emergencies did not convert commute time into compensable work. And once you're commuting, you're off work, you're out of the workplace, presumably you're free to run errands and do things. But on their way home, they had to listen to this radio. And this court held it was de minimis. So think about the commute time. Then think about your off-duty but on-call time. You're off duty. You should be free to do anything you want. And the Aiken court distinguished the use of a radio in that situation where you might be in church. You may be at your student's school play. You might be in the library where a radio going off would limit what you're able to do. But you're off work. You're off duty completely on your own time. Then in Aiken, it's kind of the middle. So you've got one spectrum on the off-duty on-call. Aiken's kind of, you know, I'm on my way home. And then there's your on-premise meal time where it's a different test. It's a different kind of freedom when you talk about predominantly for the benefit of the employer. And so I think if you think of it in those terms, this having to listen to a radio for really one thing, this emergency, is not work time. To hold otherwise, I think, would impose a completely relieved of duties test on employers. I think there's some policy implications to this, too. If an employer had to provide this idyllic work setting where it's quiet and you're not interrupted by noise and the seat's not too hard that you're sitting on, that's not what we're talking about. Quiet car on Amtrak. Right. Right. Think about a loud stamping plant where, you know, there's boom. You're stamping out parts. And employees go to their break room. And throughout the break, they're listening to this noise. Boom. Boom. I mean, does an employer have to soundproof the break room? I don't think so. There's no suggestion of that in any of the Department of Labor guidance or in the court cases. Or think of a hospital paging system. You're in the break room. Hospitals are constantly paging doctors and nurses constantly. And they're listening for that one thing, that code blue. Right. That doesn't turn it into work time. So I don't think we're obligated to provide all kinds of amenities. We do. It's really a great place to work. They get their lunches paid for. They're free to do things. And they've all admitted they actively engage in lots of activities. And under those circumstances, you can eat your meal uninterrupted and unhassled. And you can do so much more. And you're rarely interrupted. Once in ten years. No time in eight years. And you're permitted to make up a missed break. Then plaintiffs have not met their burden of showing they're not substantially relieved of duties. And that they spend their meal time predominantly for the employer's benefit. They haven't established that. I'd just like to close, unless there's any questions, with the Hill case. It quoted the Anderson v. Mount Clemens Pottery U.S. Supreme Court case. And it said, It is only when an employee is required to give up a substantial measure of his time and effort that compensable work time is involved. It's nowhere in these facts. The facts are undisputed. And we would ask that the court affirm the district court. Okay. Thank you, Mr. Pelton. Thank you. Mr. Desmond, you have some rebuttal time. Thank you, Your Honor. Just very quickly, Your Honor, in terms of the Haviland case from Iowa, that counsel and the trial court have both relied on in this case. An analysis of that case reveals sort of what we've been arguing throughout. That you need to look at all of the circumstances in a particular case. In Haviland, the record shows that while there was a machine that the employees were responsible during the course of their work break, they were permitted to leave the site of the factory. All they had to do was ask another employee, Can you keep an eye on my particular machine? The evidence in that case also showed that employees, I believe it says that during the course of their mealtimes, and not just their mealtimes but throughout their day, there was evidence that individuals were viewing pornography during their work time. I'm sorry, Haviland doesn't involve the machinery. I apologize. That was the Miracle case. Haviland does involve monitoring radios, but Haviland was the case where there was evidence that employees were viewing pornography during their work breaks and during their actual mealtime, that they were able to leave their place of work to go to a place, I believe they refer to it as the quick stop. It sounds like a convenience store. They were also allowed to leave the premises to go outside and smoke. Those are not facts that we have available in the present case. I was wrong when I thought they could go smoke. We had a Felicity case yesterday in a very similar circumstance. Right, okay. And I would again disagree with the characterization of this case in terms of the idea that this is akin to a factory worker saying, Please silence the presses while I'm trying to take lunch. That's not what we're asking for. We're not asking for the perfect situation where there's no noise, there's no distraction. What we're asking for is that the distractions that are there are not relevant to me, that I don't need to focus on those distractions and I can focus on what I choose to focus on during my time, which is my mealtime. So this isn't an instance where we're asking for an ideal setting. What we are saying is let's take a look at the totality of the circumstances and let's take a look at all the case law that's been relied on in this case. There are cases that talk about radio time. There are cases that talk about geographic limitations. But there are very few cases, apart from the two Sixth Circuit cases that we've cited to, that talk about both of those factors in conjunction to the degree that we have those factors in this case. So, Your Honors, unless there are any other questions. Apparently not. Thank you very much, Counsel. Thank you very much. I appreciate your arguments today. The case will be submitted.